**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTINE PIPP<br><br>Plaintiff,<br><br>v.<br><br>HEALTH CARE FACILITY MANAGEMENT, LLC, *doing business as COMMUNICARE FAMILY of COMPANIES*, and PAE PANH EMP, LLC, *doing business as WEXFORD HEALTHCARE CENTER*<br><br>Defendants. | ) | Civil Action No. 25-210<br>District Judge Nora Barry Fischer |

**MEMORANDUM OPINION**

I. INTRODUCTION

This civil action arises from Plaintiff Christine Pipp's ("Plaintiff" or "Pipp") employment and subsequent termination from Defendants Health Care Facility Management, LLC d/b/a CommuniCare Family of Companies and Pae Panh Emp, LLC, d/b/a Wexford Healthcare Center ("Defendants" or "Wexford"). Plaintiff alleges disability discrimination, failure to accommodate, hostile work environment, and retaliation pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADAAA") in Count I of the Amended Complaint (ECF No. 33), Interference and Retaliation pursuant to the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA") in Count II, Common Law Wrongful Discharge (Public Policy Violation) in Count III, and violation of the Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et seq.* ("PHRA") in Count IV. Presently before the Court is the Renewed Motion for Summary Judgment (ECF No. 60) filed by Defendants on all Counts with supporting documentation. (ECF Nos. 60, 61 & 61-1). Plaintiff filed a response to the Motion with supporting documentation. (ECF Nos. 64, 64-1 through 64-34). Defendants filed a Reply Brief in Support of their Motion for Summary Judgment

and a Reply in Support of their Statement of Facts along with a Supporting Appendix. (ECF Nos. 68, 69 & 69-1). The matter is fully briefed.

Having considered the parties' positions and evidence in accordance with the standard governing motions for summary judgment, for the following reasons, Defendants' Motion for Summary Judgment will be granted in its entirety.

II. FACTUAL BACKGROUND

The following facts are taken from the parties' Concise Statements of Material Facts, Responses thereto (ECF Nos. 61, 64-1, 69), and other record evidence. Where disputed, facts and all inferences are construed in favor of the Plaintiff. *See Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**<u>Plaintiff is Hired by Defendants</u>**

Pipp began her employment with Defendants as a licensed practical nurse in January 2020. (ECF Nos. 61 & 64-1 ¶ 1). She initially worked at Baldwin Healthcare Center until around August 2021, when she requested a transfer to Wexford Healthcare Center. (*Id.* ¶ 2). Plaintiff was an at-will employee and understood that she could be discharged at any time and for any reason. (*Id.* ¶ 3). The applicable Employee Handbook expressly provided that while discipline generally followed progressive steps, "[i]ndividual circumstances . . . may warrant bypassing various steps in the process . . . or not following the process at all. (*Id.* ¶ 4). The Employee Handbook further provided that for "serious" violations – including "flagrant poor performance indicating an irresponsible lack of knowledge or decision-making process, resulting in a measurable loss to the company" – termination could follow immediately. Plaintiff knew that termination could occur immediately for serious violations. (*Id.* ¶¶ 4, 5).

**December 4, 2023 Work Error and Discipline**

On December 4, 2023, Plaintiff administered the wrong intravenous solution to a Wexford resident. (*Id.* ¶ 7). Wexford's then Director of Nursing ("DON"), Damarla Taylor, suspended Plaintiff and reported the incident to the Pennsylvania Department of Health, which investigated and cited Wexford in connection with Plaintiff's error. (*Id.* ¶ 9). The Pennsylvania Board of Nursing opened an investigation and warned Plaintiff that a repeat offense could result in a fine of up to $10,000. (*Id.* ¶ 10). The Employee Handbook informed employees that a suspension is the employer's "last notice" of the need for improvement. (*Id.* ¶ 11). Plaintiff agreed in her deposition that this suspension and discipline were warranted, and that the mistake was a serious infraction, even though the patient was not harmed. (Pipp Dep., ECF No. 64-3 at 20-21).

**Plaintiff's New Position at Wexford**

In January 2024, Plaintiff was promoted to the full-time wound nurse position and given a raise. (ECF Nos. 61 & 64-1 ¶ 12).

**Plaintiff's April 5, 2024 Work Injury**

On April 5, 2024, Pipp fell from a chair at work and sustained a knee injury. (ECF Nos. 61 & 64-1 ¶ 20). She testified that after her knee injury, she did not request FMLA leave. (Pipp Dep., ECF No. 64-3 at 15, 30). She returned to work on April 11, 2024, with light duty medical restrictions including sedentary work requiring no bending, kneeling, standing, walking, or lifting, pushing, or pulling more than 5-10 pounds. (ECF Nos. 61 & 64-1 ¶¶ 20-21; Farelli Dep., ECF No. 64-7 at 13). Pipp's job modifications included desk work such as entering physician orders, confirming physician orders, completing paperwork for new admissions, preparing discharge papers, entering residents' weights, gathering meal consumption information from the aides, entering that information into the computer, and feeding residents. (Farelli Dep., ECF No. 64-7 at

14). According to Farelli, Pipp was not expected to push the wound care cart because it was contrary to her restrictions, but she would still be given the information to document the measuring of the wounds. (*Id.*).

**The New Director of Nursing, Chinonye Nwadinobi, Arrives at Wexford**

The new DON, Chinonye Nwadinobi ("Nwadinobi"), did not arrive on the floor at Wexford until April 17, 2024, one week after Pipp returned from her injury.[1] (Pipp Dep., ECF No.64-3 at 30). Plaintiff had no complaints with Wexford until after Nwadinobi arrived. (Pipp Dep., ECF No. 64-3 at 11-12). It is undisputed that Nwadinobi was a terrible manager. For instance, she would regularly scream at Pipp and other staff in the common areas of the unit. As such, other staff members, residents, and their family members witnessed Nwadinobi's inappropriate behavior. (*Id.* at 11, 12). She treated many nurses badly and many quit or were fired because of her. (*Id.* at 27). Staff reported that she would bang her fists on the nurses' station while yelling in front of her staff and speaking on the phone in an unprofessional manner. (Katic Dep., ECF No. 61-1 at 61). Nwadinobi's managerial style was characterized as dictatorial. (*Id.*). Nurses reported that when they were short staffed, Nwadinobi would expect nurses to care for a high number of patients, compromising patient safety. (Healy Dep., ECF No. 64-27 at 7; Katic Dep., ECF No. 61-1 at 60). Pipp believed that Nwadinobi was an incompetent manager, ignorant of the rules and regulations that applied to nursing homes. Accordingly, Pipp and others filed the following complaint about Nwadinobi with the Board of Nursing:

> This letter of concern is written by several nurses: Heather Spearline, Lorraine Craft, Christine Pipp, Joan Healy, Mary Beth Katic. On 4/18/24 the new DON Chinonye Nwadinobi (on her first day working independently) accused a male nurse to be drunk on the job; she took the med cart keys away from him and handed them to an LPN on WorksComp [Pipp], knowing she could not work the cart

[1] Although Nwadinobi was hired on April 10, 2024, she did not start working the floor independently until April 18, 2024. (Pipp Dep., ECF No. 64-3 at 21).

> and the DON did not bother to count the narcotics[;] even when she asked the DON to come back up to the unit[,] the nurse had to find another nurse to count the narcotics with. Additionally, medications in the system were not yet signed off and no one knew if the morning medication pass was complete. We interviewed the interviewable [sic] residents and found out that the majority of the entire front wing did not get their meds. The unit nurses were extremely concerned and terrified for their own licenses that we feel were in jeopardy that day through the actions of an incompetent director of nursing. We asked her how to document the omissions and she wrote the verbiage on a piece of paper for some, others were instructed verbally to write in the system that an internal investigation prevented the med pass to be completed. Most nurses refused to document considering that over a 100 various medications were not given to patients, including diabetics. Then, on 4/28/24 this DON refused to cover a staffing hole, forced two nurses to have over 30 patients on daylight on one unit and on another an LPN on [sic] was forced to care for over 40 patients. When nurses expressed their concern, Ms. Nwadinobi said that according to the State regulations she could have an RN take care of 250 patients which clearly showed to us that this DON is ignorant of the rules and regulations.

(ECF No. 64-23). Elena Staroselsky ("Staroselsky") submitted the complaint. (*Id.*; *see also* Pipp Dep., ECF No. 64-3 at 27). According to Plaintiff, Nwandinobi threw the medication cart keys at her on April 18, 2024, screamed at her, and told her that she had to push the medication cart and pass medications. (ECF No. 64-1 ¶ 27).

Pipp asserts that on May 2, 2024, while she was still on push and pull restrictions, Nwadinobi told her again to push a medication cart against her restrictions. (Pipp Dep., ECF No. 64-3 at 12). She testified that she complained multiple times to Janet Lowe, the Human Resources Manager. (*Id.*). She also stated that Lowe and Farelli did things to make her work against her restrictions, although she provides no details relating to Lowe and Farelli. (*Id.*). As to Nwadinobi, Plaintiff states that she said multiple times: "Oh, you're still on crutches, oh, I can find somebody else to do your job for you." (*Id.*).

Pipp telephoned the corporate hotline but was unable to recall the dates of the calls, or the persons to whom she complained. (*Id.* at 13). But after she escalated her complaints to Corporate that Wexford was not honoring her restrictions, she agrees that things changed, and on May 2, 2024, Plaintiff began receiving daily assignments from Louise Farelli, the Executive Director for Wexford. These daily assignments followed her restrictions. (*Id.* at 14; ECF No. 61-1 at 33).

**April 24, 2024 Work Error and Wound Care Demotion**

On April 24, 2024, when Pipp was assisting with admission orders, she incorrectly entered a physician order for valproic acid[2], causing a resident to receive an extra dose. (Pipp Dep., ECF No. 64-3 at 26). Pipp signed the Corrective Action Form which constituted a "Final Written Warning." (ECF No. 61-1 at 34). A "Performance/Policy" violation was indicated as the reason for the Corrective Action, specifically detailing the failure to follow nursing admission process, i.e., medication clarification, diet orders, etc. The Corrective Action Form also noted that resources were made available to Pipp "in order to maintain nursing process." (ECF No. 61-1 at 34).

During her tenure as wound nurse from January through April 2024, the number of residents with wounds at Wexford increased and their wounds deteriorated. (*Id.* ¶ 13). On April 30, 2024, Executive Director of Wexford Healthcare Center, Louise Farelli ("Farelli"), removed Pipp from the wound nurse role based upon her performance since January 2024. (ECF Nos. 61 & 64-1 ¶ 16). Although Plaintiff asserts that she was removed from the wound care position because then DON Nwadinobi was angry that Pipp had medical restrictions and could no longer push the medication cart (ECF No. 64-1 ¶ 16), a May 2, 2024, email from Farelli to Shannon Schultheis

---

[2] Valproic acid is an anticonvulsant used to treat seizures. It is also used to treat the manic phase of bipolar disorder and may also be used to prevent migraine headaches. https://www.mayoclinic.org/drugs-supplements/valproic-acid-oral-route/description/drg-20072931 (last visited October 2, 2026).

("Schultheis"), Regional Director of Operations, Pipp, Nwadinobi, and Erika Witherspoon ("Witherspoon"), a representative from Corporate, with a copy to Wexford Human Resources Manager Janet Lowe ("Lowe") provides, in part, as follows:

> Christine was informed on 4/30/24 that based on her performance since Jan 2024 (the time she took over the wound nurse role) up until her injury, she will no longer be in the wound nurse role. After her injury, Christine had continued to follow wounds, but was unable to do rounds. This was when it was discovered that multiple wound orders input by Christine were incorrect. Erika and Chinonye did review this with Christine as well. Christine has also been tasked in the wound/supervisory role to complete and assist in new admission requirements completion. There have been errors in this portion of performance, from order verification to actual order entry. Christine has received coaching and write ups for these as well. Christine also asked to rearrange the units the supervisors would cover because the 2nd floor was "too much." In this meeting on 4/30/24, we also discussed a transition plan over the next 30 days, Christine would no longer be in a supervisory role. That she was not being terminated, however, based on our current wound situation and performance[,] we needed to make the change.

(ECF No. 61-1 at 33). In addition, Farelli confirmed in deposition that it was she as Executive Director, along with the Director of Nursing, and Human Resources Manager, who discussed "what would be most appropriate to fit within [Pipp's] accommodations." (Farelli Dep., ECF No. 64-7 at 14).

**Plaintiff's Termination from Employment**

After Pipp's August 24, 2024 Final Written Warning (ECF No. 61-1 at 34), more order errors followed. On April 29, 2024, Pipp was issued another Corrective Action Form indicating that she was terminated. (ECF Nos. 64-19). Plaintiff's termination was formalized on May 10, 2024, by a Termination Checklist signed by Human Relations Manager Janet Lowe. (ECF Nos. 61 & 64-1 ¶ 25; ECF No. 61-1 at 35). Plaintiff was officially terminated on May 21, 2024. The

documented basis for termination was her nursing errors, including the April 24, 2024, Corrective Action. (ECF No. 61-1 at 35).

## III. PROCEDURAL BACKGROUND

On February 13, 2025, Plaintiff filed her original Complaint for violation of the ADA, the FMLA and Pennsylvania common law. (ECF No. 1). Defendants filed their Answer on April 14, 2025. (ECF No. 11). On May 16, 2025, Defendants filed an Amended Answer. (ECF No. 23). On August 22, 2025, Plaintiff filed her First Amended Complaint, adding a count for violation of the PHRA. (ECF No. 33). Defendants filed their Answer to the Amended Complaint on September 2, 2025. (ECF No. 36). On March 20, 2026, after three (3) extensions of the discovery deadline, Defendants filed their initial Motion for Summary Judgment (ECF No. 57). On March 24, 2026, the Court denied the Motion without prejudice and Defendants were ordered to refile their Motion by March 30, 2026, in compliance with the Local Rules for the Western District of Pennsylvania and this Court's Practices and Procedures. Defendants timely filed their renewed Motion on March 27, 2026 (ECF No. 60). After Plaintiff filed her Response to Defendants' Motion for Summary Judgment on April 24, 2026 (ECF No. 64), Defendants filed their Evidentiary Objections to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (ECF No. 67). Plaintiff responded to Defendants' Objections (ECF No. 71), to which Defendants filed a Second Set of Evidentiary Objections on May 27, 2026 (ECF No.72). Plaintiff filed her response to Defendants' Second Set of Objections on June 11, 2026 (ECF No. 77). On October 14, 2026, the Court overruled Defendants' evidentiary objections (ECF No. 78).

## IV. LEGAL STANDARD

Summary Judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ P. 56(a). A genuine dispute of material fact is one that could affect the outcome of the litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini*, 795 F.3d at 416 (citing *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324). But "conjecture and speculation" cannot create a genuine issue of material fact. *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016). The Court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the

[nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

## V. DISCUSSION AND ANALYSIS

### A. Termination in Violation of the ADA and PHRA (Counts I and IV)[3]

The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" with a disability includes "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1)(A)-(C). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

#### 1. Direct Evidence

A plaintiff may prove disability discrimination by direct evidence under a "mixed motive theory" as described in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), or indirectly through the familiar *McDonnell Douglas* burden-shifting framework, 411 U.S. 792 (1973). "Direct

[3] The PHRA is governed by the same analytical framework as the ADA and "federal courts should continue to interpret the PHRA in harmony with the ADA." *See Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 221 n.21 (3d Cir. 2024). Accordingly, the Court analyzes the ADA and PHRA claims together.

evidence" of discrimination is "evidence that is 'so revealing of discriminatory animus that it is not necessary to rely on any presumption' from the plaintiff's prima facie case to shift the applicable burden of production to the defendant." *Norfolk v. GEO Grp., Inc.*, Case No. 3:17-cv-204, 2020 WL 1873991, at *6 n.3 (W.D. Pa. April 15, 2020) (quoting *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096 n.4 (3d Cir. 1995)). Pursuant to *Price Waterhouse*, "if a 'plaintiff offers "direct evidence" of unlawful discrimination … the plaintiff need only show that the unlawful motive was a substantial motivating factor in [the employer's] decision' to take an adverse employment action against the plaintiff." *Wright v. Providence Care Center*, 2:17-cv-747, 2019 WL 4643592, at *5 (W.D. Pa. Sept. 24, 2019), *aff'd*, 822 F. App'x 85 (3d Cir. 2020) (quoting *Miller v. CIGNA Corp.*, 47 F.3d 586, 594 (3d Cir. 1995) (discussing *Price Waterhouse* concurrence by Justice O'Connor)). If plaintiff carries this initial burden, "[b]oth the burden of production and the risk of non-persuasion are shifted to the defendant who … must persuade the factfinder that even if the discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." *Wright*, 2019 WL 4643592, at *5 (quoting *Neustein v. PNC Bank, NA*, No. 15-1045, 2017 WL 3173956, at *6 (W.D. Pa. July 26, 2017) (other citation omitted)).

At the outset, Plaintiff contends that she has offered direct evidence of disability discrimination through Nwadinobi's statement: "Oh, you're still on crutches; if you can't perform the job, then we'll find someone who can."[4] (ECF No. 64 at 11).

Plaintiff, in attempting to prove discrimination with direct evidence faces a "high hurdle." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1999), *quoted in*, *Neustein*, 2017 WL 3173956, at *7. This "high hurdle" consists of demonstrating that the evidence is "strong enough

---

[4] Considering same, this statement could also be construed as accommodating Plaintiff's disability.

to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendants'] decision," and that the evidence is "connected to the decision being challenged by the plaintiff." *Wright v. Providence Care Center, LLC*, 822 F. App'x 85, 90 (3d Cir. 2020) (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (internal quotation marks and citation omitted)); *see also Armbruster v. Unisys Corp.*, 32 F.3d 768, 778-79, 782 (3d Cir. 1994) (analogizing direct evidence to the proverbial "smoking gun"). Moreover, stray remarks in the workplace or derogatory comments that are unrelated to the decisional process, even when uttered by decision makers, do not constitute direct evidence of discrimination. *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring).

As argued by Defendants, Nwadinobi's statement, which references Plaintiff's inability to push the medication cart, reflects no discriminatory animus when viewed in context of the record. Plaintiff admits that it was Nwadinobi, as the DON, who was responsible for ensuring that Wexford residents received the care that they required. (Pipp Dep., ECF No. 64-3 at 7). To this end, Nwadinobi's "dictatorial" management style is undisputed, and the record reflects that she treated those she supervised at Wexford with equal hostility and rancor. *See* Staroselsky Dep., ECF No. 64-6 at 11 (Nwadinobi's demeanor was demeaning, hostile, and obnoxious); Katic Dep., ECF No. 61-1 at 61 (describing Nwadinobi yelling and pounding her fists while expressing anger); Pipp Dep., ECF No. 64-3 at 23 (Nwadinobi was condescending to everyone); Lowe Dep., ECF No. 64-8 at 27 (Nwadinobi's behavior listed as a factor to Human Resources for staff members' resignations); Healy Dep., ECF No. 64-27 at 11 (Nwadinobi raised her voice to Healy and treated her disrespectfully). In context, her inappropriate management style had nothing to do with Plaintiff's disability, but with her efforts to run the unit. *See* Pipp Dep., ECF No. 64-3 at 7 (Pipp agreed that the DON is ultimately responsible for the delivery and quality of care to residents).

Most importantly, record evidence does not reflect that Nwadinobi's statement was related to the decisional process of Executive Director Louise Farelli, Human Resources Manager Janet Lowe, and Nwadinobi to terminate Plaintiff for poor performance. (Farelli Dep., ECF No. 64-7 at 25). As such, in construing all disputed facts in favor of Plaintiff and affording her every favorable inference, the Court finds that Nwadinobi's statement does not clear the "high hurdle" of proof to constitute direct evidence of disability discrimination.

2. Circumstantial Evidence

Because the Court finds that there is no direct evidence of discrimination, the Court applies the familiar *McDonnell Douglas* burden-shifting paradigm. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *see also Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999). Plaintiff carries the initial burden to establish a prima facie case of discrimination. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (citing *Williams v. Phila. Hous. Auth. Police Dep't.*, 380 F.3d 751, 759 (3d Cir. 2004)). To establish a prima facie case under the ADA, a plaintiff must show that (1) she was disabled within the meaning of the ADA; (2) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she suffered an adverse employment action because of her disability. *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021). A plaintiff's burden at the prima facie stage is "not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), *cited in*, *Mitchell v. City of Pittsburgh*, 995 F. Supp.2d 420, 431 (W.D. Pa. 2014).

Defendants argue that Plaintiff was not regarded as disabled within the meaning of the ADA because her knee sprain was transitory, lasting only seven weeks, and minor, because she did not require surgery or ongoing treatment. (ECF No. 60 at 4). The United States Court of

Appeals for the Third Circuit clarified, however, that "[a]n impairment lasting fewer than six months is transitory, but may not be minor, and therefore may still be regarded as a disability." *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 224 (3d Cir. 2024). The Third Circuit noted that "minor" is not statutorily defined, and whether an impairment is minor must be made on a "case-by-case basis[.]" *Id.* As in *Morgan*, the Court considers Plaintiff's medical restrictions in finding that her impairment was not minor: her restrictions required sedentary work, no bending, kneeling, standing, walking, or lifting/pushing/pulling more than 5-10 pounds. (ECF Nos. 61 & 64-1 ¶¶ 20-21; Farelli Dep., ECF No. 64-7 at 13). *See Morgan*, 114 F.4th at 224 (finding Morgan's back pain which caused "difficulty bending lifting, walking, and turning left or right" was more than minor pain). Moreover, Pipp required crutches until April 25, 2024. (Pipp Dep., ECF No. 64-3 at 13). As such, the Court finds that contrary to Defendants' argument, Plaintiff satisfies the first element of her prima facie case.

As to the second element, the Court agrees with Plaintiff that she was qualified to perform the essential functions of the job, with or without reasonable accommodations. She testified that she earned an associate degree to become a medical assistant, obtained her LPN license in 2018, and began working for Defendants in 2020. (Pipp Dep., ECF No. 64-3 at 7). To this end, she carried the appropriate training and credentials necessary for her position with Defendants. In addition, even though she was no longer pushing the medication cart when she returned to work on April 11, 2024, she continued to track/document wounds as a wound care nurse.[5] (*Id.* at 13).

---

[5] Defendants interpret this element as to whether Pipp "was performing her job satisfactorily at the time." (ECF No. 60 at 5). This is not the appropriate application of this element. *See* 42 U.S.C. § 12111(8) (A qualified individual is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires."). Plaintiff must show that she "satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires." *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 278 (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 145 (3d Cir. 1998) (*en banc*)). She must also show that she, "with or without reasonable accommodation, can perform the essential functions of the position held or sought." *Id.*

As to the final element of the prima facie case, Plaintiff argues that she has introduced evidence to create an inference that she was terminated because of her disability. (ECF No. 64 at 16-20). Plaintiff directs the Court to the following: 1) Nwadinobi's statement to Pipp that if she couldn't push the medication cart, Nwadinobi would find someone who could; 2) evidence concerning other allegedly similarly situated non-members of Plaintiff's protected class that Defendants treated more favorably; 3) that after she was terminated, Pipp was replaced by someone outside her protected class; 4) that Pipp was terminated soon after she reported her injury; and 5) Defendants' alleged departure from their discipline policy. (ECF No. 64 at 17-20).

The Court will assume that Plaintiff has carried her burden to establish a prima facie case of discrimination because the burden at the prima facie stage is "much less onerous than proving pretext with similar evidence." *Rhoden v. Children's Hosp. of Pittsburgh,* 2:14-0411, 2017 WL 4224655, at *4 (W.D. Pa. Sept. 22, 2017) (quoting *Opsatnik v. Norfolk S. Corp.*, Civil Action No. 06-81, 2008 WL 763745, at *4 (W.D. Pa. March 20, 2008), *aff'd*, 335 F. App'x 220 (3d Cir. 2009) (citing *Simpson v. Kay Jewelers,* 142 F.3d 639, 646 (3d Cir. 1998)). *See also Moussa v. Pa. Dep't of Pub. Welfare,* Civil Action No. 07-9, 2010 WL 1333333, at *8 (W.D. Pa. March 31, 2010) (analyzing the plaintiff's claims at the pretext stage where the defendant's prima facie case and pretext-based arguments each relied on the same evidence).

Next, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason" for its employment decision. *Fowler*, 19 F.4th at 299 (citing *Walton*, 168 F.3d at 668). In the instant case, Defendants have articulated several reasons for Plaintiff's suspension and termination, accompanied by contemporaneous written documentation of her performance failures. First, in December 2023, Plaintiff administered the wrong intravenous fluid to a resident. (ECF Nos. 61 & 64-1 ¶ 7). Wexford was cited by the Pennsylvania Department of Health, and

Plaintiff was warned by the Pennsylvania Board of Nursing that a repeat offense could result in a substantial fine. (*Id.* ¶¶ 9, 10). Plaintiff was suspended by Wexford's then DON Damarla Taylor. (*Id.* ¶ 9).

Second, on April 24, 2024, Plaintiff signed a Corrective Action Form confirming that she incorrectly entered an order for valproic acid, causing a resident to receive an extra dose. (ECF No. 61-1 at 34; Pipp Dep., ECF No. 64-3 at 26).

Third, from January 2024 through April 2024, when Plaintiff was the full-time wound care nurse, the number of residents with wounds at Wexford increased and their wounds deteriorated. (ECF Nos. 61 & 64-1 ¶ 13). The Executive Director of Wexford, Farelli, removed Pipp from the wound care role on April 30, 2024. (ECF Nos. 61 & 64-1 ¶ 16). A May 2, 2024 email from Farelli to Pipp and various management, describes that multiple wound care orders input by Pipp were incorrect, and that new admission requirements contained errors in order verification and actual order entries. (ECF No. 61-1 at 33).

With Defendants' articulation of its nondiscriminatory business reasons for Pipp's termination, Plaintiff must point to some evidence that might cause a factfinder to either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000) (citing *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (other citation omitted)). Plaintiff must do more than "simply show that the employer's decision is wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765 (citations omitted). She must provide evidence that could "allow a factfinder reasonably to infer that *each* of the employer's proffered

non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* at 764 (emphasis in original) (citations omitted).

As to the first prong, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012) (quoting *Fuentes*, 32 F.3d at 765). "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [disability discrimination]." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).

Here, Plaintiff admitted in deposition that she made the performance errors relied upon by Defendants as the bases for her termination. Pipp agreed that the suspension and discipline accompanying the December 2023 medication error were warranted and that the mistake in administering the wrong intravenous fluid to a resident was serious, even though the patient was not harmed. (Pipp Dep., ECF No. 64-3 at 20-21). Relating to the April 24, 2024, Corrective Action where she incorrectly entered an order for valproic acid, causing a resident to receive an extra dose, she disputed the mistake in deposition, but then agreed after questioning that she entered the order incorrectly. (Pipp Dep., ECF No. 64-3 at 26). At some point, a Performance Improvement Plan ("PIP") was discussed because of her performance from January through April. To this end, she admitted that the discussion occurred because of her performance and not because of her injury. (Pipp Dep., ECF No. 64-3 at 23). Concerning her tenure as wound care nurse from January through April 2024, where the number of wounds increased and wounds deteriorated, Plaintiff initially attempted to dispute these assertions with her own deposition testimony (Pipp

Dep., ECF No. 64-3 at 78-79), and the deposition testimony of a nurse who worked opposite shifts (Spearline Dep., ECF No. 64-34 at 6). But the May 2, 2024 email from Regional Director of Operations, Shannon Schultheis, to Pipp and Wexford Leadership stated that "when it comes to Wound Care[,] this Center ranks near the bottom of the 129 Centers that Communicare has. I have expressed my concerns with Leadership on the continued decline with wound care and prevention." (ECF No. 61-1 at 32). Plaintiff admitted that these criticisms of the wound care decline had nothing to do with her knee injury. (Pipp Dep., ECF No. 64-3 at 24). With these admissions, Plaintiff is unable to meet the first prong of the *Fuentes* analysis as a matter of law.

Under prong two, "a plaintiff must provide evidence that allows the factfinder to infer that discrimination was the 'but-for' cause of the employer's decision." *Surman v. UPMC Presbyterian Shadyside*, Civ. A. No. 17-184, 2018 WL 4901107, at *9 (W.D. Pa. Oct. 9, 2018) (quoting *Anderson v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 741 (E.D. Pa. 2015) (citation omitted)). In the instant case, Plaintiff advances several arguments as to why Defendants' proffered reasons for her termination are pretext for disability discrimination. At the outset, Plaintiff contends that discriminatory comments establish that she was terminated because of her disability. As discussed above, Nwadinobi's abusive comments and behavior, however, reflect her abrasive managerial style, and go to her insistence that residents' needs be met. *See* discussion, *supra*, at Section V.A.1. Plaintiff further argues that there are factual disputes relating to Plaintiff's work performance issues. As noted, the record reflects that Plaintiff admitted that she made the performance errors relied upon by Defendants as the bases for her termination, including the December 2023 medication error, (Pipp Dep., ECF No. 64-3 at 20), and her incorrect entry of an order for valproic acid. (ECF No. 64-3 at 26).

Plaintiff also advances a disparate treatment theory to establish pretext. Plaintiff may do so by showing "that the employer treated other, similarly situated persons not within [her] class more favorably, or that the employer discriminated against other members of [her] protected class." *Moussa*, 2010 WL 1333333, at *9 (quoting *Fuentes*, 32 F.3d at 765). *See also Wright*, 822 F. App'x at 92 (citing *Simpson*, 142 F.3d at 645) ("[P]laintiff can demonstrate pretext by presenting evidence that similarly situated persons not within plaintiff's protected class were treated more favorably by defendant employer.")). *See also Zahavi v. PNC Fin. Serv. Group, Inc.*, Civil Action No. 07-376, 2009 WL 904699, at *12 (W.D. Pa. Mar. 31, 2009) (citing *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004)). Employees are "similarly situated" when they "dealt with the same supervisor [and] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Zahavi*, 2009 WL 904699, at *12 (quoting *Ogden v. Keystone Residence*, 226 F. Supp.2d 588, 603 (M.D. Pa. 2002)) (internal quotations omitted). Accordingly, a plaintiff attempting to establish pretext based upon inconsistent disciplinary actions must show that the comparator's misconduct "[was] of comparable seriousness to [her] own infraction" and that no "differentiating or mitigating circumstances" existed. *Tyler v. SEPTA*, Civ. A. 99-4825, 2002 WL 31965896, at *3 (E.D. Pa. Nov. 8, 2002), *aff'd*, 85 F. App'x 875 (3d Cir. 2003). "[S]ummary judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated." *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp.2d 517, 526 (E.D. Pa. 2014) (citing *Opsatnik*, 335 F. App'x at 223-24).

In attempting to meet this heavy burden, Plaintiff relies upon four (4) non-disabled comparators: 1) Joan Healy ("Healy"); 2) Cheryl Parkinson ("Parkinson"); 3) Grace Laxamana ("Laxamana"); and 4) Chinonye Nwadinobi. None of these individuals are valid comparators. At

the outset, and as noted by Defendants, the relevant supervisory time frame is the Taylor-Nwadinobi period from October 2023 through July 9, 2024. (Damarla Taylor Dep., ECF No. 69-1 at 45-46 (Taylor hire and resignation dates); Pipp Dep., ECF No. 64-3 at 21 (Nwadinobi hire and resignation dates)). Joan Healy has worked at Wexford since 2011. The Healy disciplines reflected at ECF No. 64-26 at 2-17, were all issued outside of the relevant supervisory period, and are not probative of how Taylor or Nwadinobi treated comparable conduct. *See* ECF No. 64-26 at 2-17. Many occurred early in her tenure with Wexford from 2012 through 2018 and involved absenteeism or tardiness. (ECF No. 64-26 at 7-9, 11, 16). None of them were as serious as Plaintiff's December 2023 infraction where she administered the wrong intravenous medication that triggered a state agency citation against Wexford, and a nursing license investigation. (ECF Nos. 61 & 64-1 ¶¶ 9, 10). Moreover, unlike Pipp's December 2023 medication error, the record reflects no further Healy disciplines after her lone medication error, only a "Concern Form" and "Employee Coaching Session Form" relating to leaving patient medications at beside. *See* ECF No. 64-26 at 2-17 & 3-4.

Similarly, only two of Parkinson's corrective actions occurred during the Taylor-Nwadinobi supervisory period, both of which involved absenteeism, which are hardly comparable to the Plaintiff's intravenous medication mistake. *See* ECF No. 64-25 at 2-17.

As to Laxamana, Plaintiff relies on the deposition of Elena Staroselsky for the alleged misconduct of Laxamana. Laxamana was never deposed, and Plaintiff directs the Court to no documents to substantiate Staroselsky's accounts.[6] According to Staroselsky's deposition testimony, Laxamana refused to confer with other unit nurses as to who would cover the middle

[6] In deposition, Starolesky admits that in April 2024, Laxamana filed a complaint against her for race discrimination and that the complaint was investigated. When asked if that complaint was the basis for her (Starolesky's) suspension, she could not remember whether the complaint was the reason but was not aware of any other act that would have led to her suspension. (Starolesky Dep., ECF No. 64-6 at 27).

section of the unit. When questioned by Staroselsky as to whether she spoke to the nurse on the adjacent unit to work out the assignment, she refused to respond and walked away. (Staroselsky Dep., ECF No. 64-6 at 8-9). When Staroselsky attempted to give her a coaching on the issue, Laxamana started screaming and making a scene, saying that Staroselsky was "picking on her." (*Id.* at 9). Laxamana was not issued a discipline for this behavior. (*Id.*). Based upon Staroselsky's deposition testimony, it appears that she held some type of supervisory role over Laxamana at the time, not Taylor or Nwadinobi, although the record is unclear. More importantly, the testimony does not reflect serious patient medication errors as those committed by Plaintiff. Laxamana is simply not a valid comparator.

Finally, Nwadinobi cannot be a valid comparator if she was Plaintiff's supervisor; they had entirely different responsibilities in their respective roles at Wexford and cannot be similarly situated as a matter of law. *See Langley v. United Parcel Serv., Inc.*, No. 21-2962, 2023 WL 1433609, at **4-5 (3d Cir. Feb. 1, 2023) (subordinate and supervisor are not similarly situated).

Plaintiff also contends that her replacement by individuals outside her protected class, i.e., those who did not request modified duties because of a disability, is evidence of pretext. (ECF No. 64 at 21). Pipp states that after her termination, Defendant replaced her with Christine Fitzgerald and Parkinson, neither of whom were disabled. Replacement by members outside the protected class does not necessarily raise an inference of discrimination. *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352-53 (3d Cir. 1999). The Court is unpersuaded by Plaintiff's replacement argument in the healthcare setting where sufficient staffing is critical for patient safety. *See id.*

Plaintiff also submits the testimony of corroborating witnesses Spearline and Staroselsky as evidence of Defendants' discriminatory conduct. (ECF No. 64 at 21). Conversely, Staroselsky

unequivocally testified that she understood that Pipp would be performing modified duties after her knee injury, that she never witnessed anyone at Wexford making negative comments about her work injury, or her accommodation needs. (Staroselsky Dep., ECF No. 64-6 at 16-17). Moreover, she never witnessed Nwadinobi in conversations with Pipp about her work injury or about her modified duties. Rather, she testified that other nurses filled in and pushed the medication cart for Pipp, and that after her injury on April 5, 2024, Plaintiff no longer pushed the wound care cart. (*Id.* at 17, 26). Although she stated that Plaintiff continued to perform satisfactorily after her injury (*id.*), she also testified that she never audited Plaintiff's electronic orders for which Plaintiff was disciplined. (*Id.* at 26). Likewise, Spearline's testimony reflects that she and Pipp worked opposite shifts, and that she did not directly observe Pipp in the performance of her job functions. (Spearline Dep., ECF No. 64-34 at 6, 11). Regarding her familiarity with Pipp's documentation, Spearline testified that she would see Pipp's progress notes, but she did not audit Plaintiff's documentation in the PointClickCare electronic system at Wexford. (*Id.* at 11). In this Court's estimation, the testimony of Spearline and Staroselsky do not corroborate Plaintiff's claims of disability discrimination.

Plaintiff further relies on deviations from the Employee Handbook's discipline procedures as evidence of pretext. Record evidence reflects, however, that Plaintiff was suspended in December 2023, issued a final written warning on April 24, 2024 (ECF No. 61-1 at 34), followed by termination after additional order entry errors on April 29, 2024 (ECF Nos. 64-19; 61-1 at 35). *See Katz v. UPMC*, 835 F. App'x 664, 667 (3d Cir. 2020). Moreover, it is undisputed that the Employee Handbook provides that individual circumstances, including performance records, prior disciplines, and the nature of an offense, may warrant bypassing steps in the progressive disciplinary process, or not following the procedures at all. (Employee Handbook, ECF No. 61-1

at 24; ECF Nos. 61 & 64-1 ¶ 4). Accordingly, the Court finds that the alleged deviation from disciplinary procedures does not support Plaintiff's argument that discrimination was the real reason for her termination.

Finally, Plaintiff argues that the timing of her suspension within 30 days of her injury, and just a few weeks after Nwadinobi made her April 18, 2024 comments about her inability to push the medication cart is evidence of invidious discrimination. (ECF No. 64 at 21). Record evidence is undisputed, however, that the termination process began with the December 2023 medication error, several months before Plaintiff's April 5, 2024, knee injury. With her suspension, Plaintiff was placed on notice that her patient care practices needed to improve. Defendants provided Plaintiff with an opportunity to improve with her wound care promotion, but wounds at Wexford continued to decline, and the decision was made to remove her from the position of wound care nurse. *See* ECF Nos. 64-20 at 2. Plaintiff admitted that the wound care decline was real, and that criticisms of her as the wound care nurse had nothing to do with her knee injury. (Pipp Dep., ECF No. 64-3 at 24). Accordingly, Plaintiff fails to raise an issue of material fact as to the second prong of the *Fuentes* analysis.

As such, no reasonable trier of fact could conclude on this record that Plaintiff was terminated because of her disability, and summary judgment must be granted on Plaintiff's claim for termination in violation of the ADA and PHRA in Counts I and IV of the Amended Complaint.

B. <u>Retaliation in Violation of the ADA and PHRA (Counts I & IV), and Common Law Wrongful Discharge (Count III)</u>

The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding or hearing under this chapter. 42 U.S.C. § 12203(a). The same is true under the PHRA. 43 P.S. § 955(d).

To establish a prima facie claim of retaliation, a plaintiff must show that (1) she engaged in protected activity; (2) her employer subjected her to an adverse employment action; and (3) "a causal connection [existed] between the employee's protected activity and the employer's adverse action." *Williams*, 380 F.3d at 759; *see also Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002). Making a request for a disability accommodation in good faith is a protected activity. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) (finding that the right to request an accommodation in good faith is protected conduct), *cited in*, *Kieffer v. CPR Restoration & Cleaning Servs, Inc.*, 733 F. App'x 632, 638 n.26 (3d Cir. 2018).

As to causation, a plaintiff may establish a causal connection by showing that the temporal proximity between the protected activity and the adverse action is "unusually suggestive," or through a combination of timing and other evidence of ongoing antagonism or retaliatory animus. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000). "It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). If Plaintiff establishes a prima facie case of retaliation, the court proceeds to the subsequent steps of the *McDonnell Douglas* framework. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

Relatedly, in 1998, the Pennsylvania Supreme Court held that under Pennsylvania law, an at-will employee may not be discharged in retaliation for filing a workers' compensation claim. *Shick v. Shirey Lumber*, 716 A.2d 1231, 1237-38 (Pa. 1998). *See also Villard v. Whitemarsh Continuing Care Ret. Cmty.*, Civi Action No. 10-7230, 2012 WL 6562767, at *4 (E.D. Pa. Dec.

17, 2012) ("[A]n employee engages in protected activity under Pennsylvania law when her injury causes the filing of a worker's compensation claim . . . ."). "The Third Circuit Court of Appeals has directed district courts to apply the Title VII framework for a retaliation claim to a worker's compensation retaliation claim brought under Pennsylvania law." *Id.* (citing *Theriault v. Dollar Gen.*, 336 F. App'x 172, 175 (3d Cir. 2009)).

Plaintiff argues that she can establish that Defendants retaliated against her for requesting accommodations for her April 5, 2024 knee injury; complaining about disability discrimination; and for filing a worker's compensation claim after her work-related injury. She directs the Court to the temporal proximity between her protected activities and her subsequent termination. (*Id.* at 24-25).

Undisputed record evidence does not support Plaintiff's claims of retaliation, despite this temporal proximity. She cannot demonstrate a causal connection between her termination and requests for accommodations/complaints of disability discrimination, or for filing a worker's compensation claim. To this end, Defendants have articulated legitimate, non-retaliatory reasons for her termination by way of Plaintiff's documented and repeated nursing errors that compromised patient safety. *See* discussion, *supra,* at V.A.2. Plaintiff is unable to show that these reasons are pretext for retaliation. Importantly, one of her most egregious medical mistakes, administering the wrong intravenous medication to a Wexford resident in December 2023, occurred well before her knee injury and the alleged protected activities that followed. Accordingly, her retaliation claims are defeated by the same disciplinary record that defeated her claim of disability discrimination.

No reasonable jury could conclude on this record that Plaintiff's suspension and termination were in retaliation for requesting accommodations for her knee injury, complaining about perceived discrimination, or filing a worker's compensation claim. Therefore, Defendants'

Motion for Summary Judgment on Plaintiff's claims for retaliation in violation of the ADA and PHRA in Counts I and IV, and under Pennsylvania common law for filing a workers' compensation claim in Count III must be granted.

C. Failure to Accommodate in Violation of the ADA and PHRA (Counts I & IV)

To prove that an employer failed to provide reasonable accommodations by failing to engage in good faith in an interactive process, a plaintiff must show that "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Colwell*, 602 F.33d at 504 (quoting *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 772 (3d Cir. 2004)). *See also Franzi v. UPMC Presbyterian Shadyside*, Civil No. 12-1432, 2014 WL 4384545, at *13 (W.D. Pa. Sept. 4, 2014).

Here, the parties do not dispute that Plaintiff received accommodations for her disability. Plaintiff returned to work after her knee injury on April 11, 2024, with light duty medical restrictions. (ECF Nos. 61 & 64-1 ¶¶ 20-21; Farelli Dep., ECF No. 64-7 at 13). She testified that she had no complaints upon her return until after Nwadinobi arrived on the unit on April 17, 2024.[7] (Pipp Dep., ECF No. 64-3 at 11-12). After Plaintiff escalated her concerns to Corporate, the parties agree that things changed, and by May 2, 2024, Plaintiff began receiving daily assignments from Farelli, which followed her restrictions. (Pipp Dep., ECF No. 64-3 at 14; ECF No. 61-1 at 33). Other record evidence reflects that after Pipp returned to work, other nurses filled in and pushed the medication cart for her. (Staroselsky Dep., ECF No. 64-6 at 17, 26).

[7] It wasn't until Nwadinobi's first day working independently, on April 18, 2024, that Nwadinobi threw the medication cart keys at Plaintiff and told her to push the cart. *See* Board of Nursing Complaint re Nwadinobi, ECF No. 64-23.

Accordingly, judgment as a matter of law must be granted on Plaintiff's claim for failure to accommodate in violation of the ADA and PHRA in Counts I & IV of the Amended Complaint.

D. Hostile Work Environment in Violation of the ADA and PHRA (Counts I & IV)

To establish a claim for hostile work environment pursuant to the ADA and PHRA, a plaintiff must prove the following:

> (1) [she] is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [defendants] knew or should have known of the harassment and failed to take prompt effective remedial action.

*Walton v. Mental Health Ass'n of S.E. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998). The ADA "'does not make all harassment, or every unpleasant working environment, actionable under the law.'" *Campo v. Mid-Atlantic Packaging Specialties, LLC*, 564 F. Supp.3d 362, 396 (E.D. Pa. 2021) (quoting *Barclay v. Amtrak*, 435 F. Supp. 2d 438, 448-49 (E.D. Pa. 2006)). *See also Gabriel v. DSM Biomedical, Inc.*, 187 F.4th 77, 82 (3d Cir. 2026) ("Sporadic instances of bullying or microaggressions by [a supervisor] do not rise to the level of a hostile work environment as a matter of law."); *Dreshman v. Henry Clay Villa*, 733 F. Supp.2d 597, 612-13 (W.D. Pa. 2010) (alleged harassment consisting of sporadic instances of slight touching or pinch was not severe or pervasive). "In determining whether a plaintiff has established a case of hostile work environment sufficient to defeat summary judgment, a court must consider the record as a whole." *Barclay*, 435 F. Supp. 2d at 449 (citing *Cardenas v. Massey*, 269 F.3d 251, 260-61 (3d Cir. 2001)).

The record in this case does not reflect that Pipp was harassed because of her disability. Rather, her supervisor, Nwandobi, appears throughout the record as an abrasive, dictatorial manager who behaved inappropriately to her staff members in general. She was indiscriminate in her selection of targets. *See* Staroselsky Dep., ECF No. 64-6 at 11 (Nwadinobi's demeanor was demeaning, hostile, and obnoxious); Katic Dep., ECF No. 61-1 at 61 (Nwadinobi yelling and pounding fists while expressing her anger); Pipp Dep., ECF No. 64-3 at 23 (Nwadinobi was condescending to everyone); Lowe Dep., ECF No. 64-8 at 27 (Nwadinobi given as a factor for some staff members' resignations); Healy Dep., ECF No. 64-27 at 11 (Nwadinobi raised voice to Healy and treated her disrespectfully). As recently noted by Judge Bibas in *Gabriel*, "[n]o law or employment term forbids having an intense or stressful workplace …." 187 F.4th at 79.

Accordingly, no reasonable trier of fact could conclude that Nwadinobi harassed Pipp because of her disability. Defendants are entitled to judgment as a matter of law on Plaintiff's hostile work environment claim in violation of the ADA and PHRA in Counts I & IV of the Amended Complaint.

E. Family Medical Leave Act--Interference and Retaliation (Count II)

In order to prevail on an FMLA retaliation claim, a plaintiff must demonstrate that she invoked her right to FMLA leave, that she suffered an adverse employment action, and that the adverse action was causally related to her invocation of rights under the FMLA. *Fritz v. Allied Servs. Foundation*, No. 3:21 cv 1996, 2024 WL 843918, at *7 (M.D. Pa. Feb. 23, 2024) (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012) (other citation omitted)). An employee must ask for a medical leave. *Hileman v. West Penn Allegheny Health Sys., Inc.*, 182 F.4th 283, 287 (3d Cir. 2026). An employer is not "required to hunt for a possible accommodation request that was never made." *Id.*

To make out a claim of interference pursuant to the FMLA, a plaintiff must establish that "[s]he was entitled to benefits under the FMLA and that [s]he was denied them." *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005). A plaintiff may also establish an interference claim where the employer takes any action that could chill the desire to take FMLA leave. *Fritz*, 2024 WL 843918, at *6 (citing *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 501 (M.D. Pa. 2015) (other citations omitted)).

Here, Plaintiff stated unequivocally that she knew she had a right to family medical leave if she wanted to take it, and that she never requested FMLA leave because "a portion of [her income] doesn't pay the bills." (Pipp Dep., ECF No. 64-3 at 30). She further agreed that nothing Nwadinobi could have said to her would have prevented her from requesting leave. (*Id.*). With these admissions, judgment as a matter of law must be entered for Defendants on Plaintiff's claim for interference and retaliation under the FMLA. *See Hileman*, 182 F.4th at 287.

I. CONCLUSION

In conclusion, Plaintiff has failed to direct the Court to any record evidence to create an issue of material fact that her termination was the product of unlawful discrimination or retaliation. Her conjecture and speculation are not enough to create an issue for trial on any of her ADA claims. *See Wiest*, 812 F.3d at 328. Instead, the record reflects that Plaintiff was terminated because of her repeated documented nursing errors, many of which compromised patient safety. Similarly, Defendants are entitled to judgment as a matter of law on Plaintiff's FMLA and hostile work environment claims, as no rational trier of fact could find in favor of Plaintiff on this record. Summary judgment is therefore appropriate on each of Plaintiff's claims.

Appropriate Orders follow.

Dated: October 14, 2026

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

cc/ecf: All counsel of record